1  Allan D. NewDelman, Esq. (004066)
   Roberta J. Sunkin, Esq. (011993)
2  ALLAN D. NEWDELMAN, P.C.
   80 East Columbus Avenue
3  Phoenix, Arizona 85012
   (602) 264-4550
4  anewdelman@adnlaw.net

5  Attorney for Debtor

6  UNITED STATES BANKRUPTCY COURT

7  DISTRICT OF ARIZONA

8  In re                                    ) In Proceedings Under
                                            ) Chapter Eleven
9  CALES & FITZGERALD, PLLC,                )
                                            )
10                                          ) Case No. 2-20-bk-10911 DPC
                                            )
11                                          ) DEBTOR'S RESPONSIVE
                                            ) MEMORANDUM RE: CONVERSION
12            Debtor.                       ) OR DISMISSAL
                                            )
13 _____)

14

15       Debtor, CALES & FITZGERALD, PLLC, by and through counsel, Allan D. NewDelman,

16 P.C., hereby submits its Responsive Memorandum in support of its position as follows:

17       It must be stated at the outset that the Brief In Support of Motion to Convert filed at Docket

18 Number 128 is, for the most part, devoid of any case law that supports the wishes of Gloria Cales,

19 to wit, to get out from under major State Court litigation under the guise that conversion of this

20 Chapter 11 to a Chapter 7 is in the best interest of the creditors and the bankruptcy estate. Further,

21 while rehashing the Docket history of this case may be informative to those not familiar with such

22 history, it certainly does not address the issue at hand. The only issue this Court needs to resolve is

23 whether or not this case should be converted or dismissed. The prior history, which may go to the

24 "cause" element of 11 U.S.C. § 1112, is not relevant as the parties have stipulated that "cause" exits.

25       Having said the above, the arguments that Ms. Cales propounds under item "C" (beginning

26 on page 10) in her Opening Brief lack substance and merit. Taken in order as stated in her Brief:

27

28

**Item C 1**

Ms. Cales asserts that cause exists to convert the case as the "Debtor is not an operating entity". The lack of operations does not impact a determination as to what is in the best interest of creditors and the estate, or whether conversion or dismissal is appropriate. It impacts "cause" which is not at issue. Further, while the failure to file Operating Reports for an entity that admittedly, is not generating revenues, is additional ground for the establishment of "cause", such failure (which has since been rectified) is not relevant to a determination as to what is in the best interest of creditors and the estate. Lastly, the characterization that this Debtor "filed an unconformable plan to meet the 90-day deadline of 11 U.S.C. § 1189(b) only to withdraw the plan when it was forced to proceed" is misleading at best and a down-right lie at worst. Ms. Cales is all too familiar with the Debtor's wish to dismiss this case, even before current counsel officially became the attorney of record. She (and the Subchapter V Trustee) have thrown road block after road block at the attempt to dismiss the case. Her actions are understandable considering that she has everything to lose should this case be dismissed. Further, the Debtor was not "forced" to withdraw its Plan. It stipulated to do so for the sole purpose of getting before this Court the real issue, should this case be dismissed or converted.

**Item C 2**

There is nothing in the record before this Court showing that the Debtor (Cales & Fitzgerald, PLLC) has a conflict of interest that prevents it from acting in the best interest of creditors. The facts in evidence, mainly the pending litigation against Ms. Cales, actually show that Ms. Cales has the conflict in arguing that this case should be converted. Her initial "settlement" proposal was an attempt to extricate herself from the litigation against her by making a nominal proposal to settle, not only the claim of the Debtor, but the claim of the Debtor's principal to which this Court has no jurisdiction. Once she understood that the multi-million dollar claim held by Lane Fitzgerald against her was not going away, she had the audacity 1) to file a "bogus" Proof of Claim and 2) reduce the already nominal offer to something far less while removing the attempt at imposing a settlement against a non-debtor. Now that's one calling the kettle black. Further, her comment that the Debtor

2

refused to discuss settlement is again misleading at best and a down-right lie at worst. The amounts in controversy far exceed the pathetically small offers made. Had she proposed a "real" offer, her overtures may have been fruitful, but, where there are millions of dollars at stake, an offer of a pathetic $225,000.00 (something that will not leave anything for administrative claims, let alone any "valid" unsecured creditor - if any) does not merit a response. These parties had attempted mediation in State Court at least twice. Ms. Cales is fully aware of the type of settlement offer that would generate interest. She simply is not willing to come to the table.

### Item C 3

The very first comment Ms. Cales makes under this subsection of her Brief is that the "Debtor does not have a licensed Arizona attorney. . .". It is presumed that this comment is directed at Lane Fitzgerald since Ms. Cales breached her contract with the Debtor. Undersigned realizes that this Court is not privy as to "why" Mr. Fitzgerald is currently not licensed in Arizona. Fortunately, Mr. Fitzgerald has a voice and now, by way of the Affidavit attached hereto and incorporated herein by reference as **Exhibit "A",** chooses to apprise this Court of the reason his application is still pending, and that reason is, Ms. Cales.

Ms. Cales raises an issue of the Debtor's alleged unwillingness to pay the administrative expenses of this estate as evidence that such (if true) shows that conversion is in the best interest of the estate. What Ms. Cales fails to address is why or how conversion would rectify this alleged unwillingness. Her pathetic offer of $225,000.00 will simply have to be paid to Byline Bank and will not be utilized to pay any administrative claim, including that of Debtor's Counsel. Further, her assertion that the Debtor is not (or, should I say, was not) willing to explore payment to the Subchapter V Trustee misstates the record before this Court and, more importantly, the concerns of this Court relative to a two party dispute and the cost of the administration of this case. It must be noted that the statements made in two prior hearing are directly relevant.

The first Hearing Mr. NewDelman attended as attorney for the Debtor was held on December 7, 2020. As indicated in the audio recording located at docket 87, the following comments were made during the course of that Hearing:

3

| | | |
|---|---|---|
| Mr. NewDelman: | | Debtor is not opposed to a dismissal. We would accept a dismissal and send the parties to where they were before the case was filed. . . |
| The Court: | | Mr. Meda, we don't have a position taken by Byline as to whether there aught to be a dismissal or a conversion. . . But the thing that has me thinking that a dismissal makes some sense is that Mr. NewDelman's client is concerned that what you're really looking for on a conversion is to be able to buy the litigation on the cheep, to settle it in a way that you couldn't settle it outside of bankruptcy and is that really a proper method for me to be going along with? |
| Mr. Meda: | | Well your Honor, we think it is. . . |

The Court then continued the Hearing due to its concern over the largest legitimate creditor, Byline Bank ("Byline"). As this Court so aptly directed to Counsel for Byline:

| | | |
|---|---|---|
| The Court: | | I'm inclined to give your client a week or so to come back and tell me what do you think is best for your client because if it really is the best interest of creditors in this case, that really boils down to your client because everybody else is relatively de minimis compared to your client and so my question for you is this, if I continue this matter for a week would your client be in a position to come back and say door A, B or C or flat out say, judge it's your call?. . . So **I'm mindful of the fact that we're spending administrative dollars here**. . .but right now we have the debtor saying just dismiss this case and we'll figure it out from there. We're hearing Mr. Meda saying no just convert this case, got the goods on that issue, just convert it now. **But because this is a two party dispute,** I'm not so sure I'm ready to pick the path of Mr. Fitzgerald or Ms. Cales but instead see it a lot more important to hear what Byline has to say". (Emphasis added.) |

At the Continued Hearing, held on December 15, 2020, it became clear that Byline took no position relative to the dismissal or conversion therefore the largest legitimate creditor of this case was willing to allow this Court to make its own informed and intelligent decision as to what was in the best interest of the creditors and the estate. It must be noted that from October 1, 2020 (the first entry on Mr. Simpson's billing records) and the date of the second Hearing, December 15, 2020 (a mere 76 calendar days later) the Subchapter V Trustee had run up a bill over $31,000.00! Clearly this Court's comments at the December 7, 2020 Hearing are well taken.

Ms. Cales further asserts that a dismissal will cause other creditors (all two of them - both law firms - both capable of handling their own affairs) to "stand still" if this case were dismissed is disingenuous and misleading. The point of fact is that delaying the dismissal of this case puts both of those creditors in a worse position while waiting for money that will **never** be paid to them. The

4

administrative expenses of this case are absurd and, unless Ms. Cales is willing to immediately tender a Chapter 7 Trustee funds in excess of the Byline secured proof of claim, nothing, I repeat, **nothing**, is going to be paid to either law firm. As stated above, the administrative expense claim of the Subchapter V Trustee is absurd. The total fee requested from October 1, 2020 through January 25, 2021 is $45,826.00. Prior to being appointed to represent this Debtor, Mr. NewDelman suggested to the Subchapter V Trustee that this case was nothing more than a two party dispute. This Court has recognized this to be true. Mr. NewDelman had further suggested that this case was ripe for dismissal thus allowing the two parties to return to State Court. Instead of supporting what is clearly the best interest of the creditors **and** the bankruptcy estate, the Subchapter V Trustee continued to run the clock and is continuing to do so as I type this Response. This needs to end and end now. Converting this case will simply invite a Chapter 7 Trustee to hire an attorney and continue to run up fees and expenses that will never be paid. Further, a dismissal does not leave the de minimis creditors without remedy. Both are sophisticated law firms with the ability to protect their rights as allowed under State law.

### Item C 4

Ms. Cales asserts that the Subchapter V Trustee does not support dismissal. Of course that is the case. He has amassed over $45,000.00 in fees (reasonable or not) and, if this case is dismissed, he has no ability to even try to recover one dime. Undersigned is mindful that a Subchapter V Trustee's job is to assist in the confirming of a consensual Plan. Clearly that is not what took place here. When it became apparent that this Chapter 11 was nothing more than a two party dispute the Trustee should have taken steps to minimize the cost to this estate. He did not.

Ms. Cales asserts that the United States Trustee ("UST")does not support dismissal. Unfortunately for Ms. Cales, that is not what Ms. Giaimo alluded to at the December 15, 2020 hearing. In fact, the UST has not really chimed in on what is in the best interest of the creditors and the estate. Instead, she voiced an off the cuff opinion without weighing what this Court is reviewing now. On December 15, 2020 Ms. Giaimo stated the following:

5

| Ms. Giaimo: | . . . maybe I'm not understanding everything fully but my understanding is that the Debtor is admittedly administratively insolvent which gives cause to convert the case right now without an evidentiary hearing. . . So rather than have evidentiary hearing and incur further costs, it makes, in the US Trustee's view, that the case just be immediately converted. . . as far as a structured dismissal I agree with Mr. Meda that I can't give any opinion on that without seeing any details. Those are definitely subject to be more scripted than a straight dismissal without any kind of you know, specific provisions for payment of claims. . . |
|---|---|

Since the UST has not given this Court a thorough analysis of the facts and the applicable law, one cannot conclude that the comments made by Ms. Giaimo on December 15, 2020 support a conclusion that the UST believes that conversion (as opposed to dismissal) is in the best interest of the creditors and the estate.

### Item C 5

One thing that Ms. Cales got right is that this Debtor asserts that Byline holds a security interest in "settlement proceeds". Counsel for the Debtor has been asserting this *ad nauseam* since before being appointed as Counsel for the Debtor. Mr. NewDelman predicted everything that has happened in this case as it relates to 1) the amount of Byline's amended claim; 2) Byline's secured status, and, most importantly, 3) the need to stop the run up of fees. I direct this Court's attention to several emails between Mr. NewDelman, Mr. Meda and Mr. Simpson attached hereto and incorporated herein by reference as **Exhibit "B"**.

October 25, 2020 at 11:20 a.m. - email from Mr. NewDelman to Mr. Simpson asking if Mr. Simpson had gotten Byline to forego its lien on "accounts" and "general intangibles".

October 25, 2020 at 2:55 p.m. - email from Mr. Simpson to Mr. NewDelman asserting (incorrectly) that Byline has no claim to the commercial tort claims.

November 5, 2020 at 8:20 p.m. - email from Mr. NewDelman to Mr. Meda and Mr. Simpson warning them that Byline's security agreement will attach to the contract and tort claim and urging them to stop the financial bleeding by a dismissal of the case.

November 5, 2020 at 9:08 p.m. - email from Mr. Simpson to Mr. NewDelman and Mr. Meda asserting (incorrectly) that Byline has no lien on the commercial tort claim.

6

1    While all acknowledge that Byline would be secured by the breach of contract claim against

2    Ms. Cales, Mr. Simpson held the belief that Byline was not secured by the tort claims.    The

3    Subchapter V Trustee, who had been approached by Ms. Cales with a supposed "offer", simply did

4    not take the additional step to research the issue. If he had taken that step he might have come to the

5    conclusion that Mr. NewDelman was correct: 1)This is a two party dispute that does not belong in

6    bankruptcy; and 2) There is no money in this case to fund the Subchapter V Trustee's fees or any

7    other administrative fees. Mr. Simpson simply made a mistake but this Debtor should not bear the

8    burden of this mistake nor should this mistake allow Ms. Cales to get out from under her alleged

9    misdeeds "on the cheep".

10    Unfortunately, Mr. NewDelman's arguments fell on deaf ears. Fortunately, Byline Bank

11    knew better. After foreclosing on the real estate, it amended its claim to reduce its **secured**[1] status.

12    Attached to its Amended Claim is all the evidence proving that it retains a secured interest in any

13    proceeds that may be gained from the cause of action against Ms. Cales (either in contract or tort).

14    What is even more concerning is Ms. Cales failure to recognize this security interest, instead

15    asserting that "Byline's collateral does not include after acquired tort claims including the tort claims

16    against her". Unless undesigned has missed something, Ms. Cales' assertion is simply **wrong.**

17    As we all know, property rights are determined under State law and the case law that has

18    interpreted the same. Ms. Cales asserts that "Byline's collateral does not include after acquired tort

19    claims including the tort claims against her". Citing no case law, Ms. Cales directs this Court to

20    ARS § 47-9102 for the proposition that "general intangibles do not include commercial tort claims".

21    Let's look at the Arizona Statutes:

22

23

24

25

─────────────────────

26        [1]It is noted that Ms. Cales incorrectly states on page 6, line 5, of her Brief, that "On January 21, 2021, Byline
amended its Proof of Claim No. 2 asserting an unsecured deficiency claim following its trustee's sale of the Property in

27    the amount of $572,535.00".

28                                                              7

ARS 47-9102 - definitions

(12) "Collateral" means the property subject to a security interest or agricultural lien. Collateral includes:
 (a) Proceeds to which a security interest attaches;
 (b) Accounts, chattel paper, payment intangibles and promissory notes that have been sold; and
 (c) Goods that are subject of a consignment.

(13) "Commercial tort claim" means a claim arising in tort with respect to which:
 (a) The claimant is an organization; or
 (b) The claimant is an individual and the claim:
  (i) Arose in the course of the claimant's business or profession; and
  (ii) Does not include damages arising out of personal injury to or the death of an individual.

(42) "General intangible" means any personal property, including things in action, other than. . .commercial tort claims. . . General intangible includes payment intangibles and software.

(61) "Payment intangible" means a general intangible under which the account debtor's principle obligation is a monetary obligation.

On its face, Ms. Cales' might be correct. However, as cited in its Opening Memorandum, the Debtor has debunked this false narrative. . "Article 9 considers payment intangibles of . . . commercial tort actions to be general intangibles. Once the payment intangible comes into existence, in this case as an after-acquired settlement fund general intangible, it is automatically within the scope of Article 9 as part of the secured creditor's collateral". *In re Wiersma*, 324 B.R. 92 (9th Cir BAP 2005), *reversed on jurisdictional grounds*, 483 F.3d 993 (9th Cir. 2007). While the *Wiersma* decision was reversed on jurisdictional grounds, it findings are supported by subsequent rulings both inside and outside of the State of Arizona. "While the precedential effect of the BAP's decision in *Wiersma* is vitiated by subsequent reversal on jurisdictional grounds by the Ninth Circuit, I find the reasoning of *Wiersma* persuasive, particularly in light of the cited consistent Ninth Circuit authorities" *In re Endresen*, 530 B.R. 856, 869 (Bankr. Or. 2015). The prior Ninth Circuit authority that *Endresen* is referencing is the dicta stated in, *In re Pacific/West Communications Group, Inc.* 301 F.3d 1150 (9th Cir. 2002) where the Court of Appeals determined that, in light of the current UCC law, such law "now allows a security interest to be attached to the proceeds of a tort claim" *Id.* at 1152.

8

1    Ms. Cales may argue that the rulings relating to an Oregon or California bankruptcy

2    proceeding are not material. While it is noted that the California and Oregon version of the Uniform

3    Commercial Code are similar if not exactly the same as the UCC adopted in Arizona, undersigned

4    admits that she was unable to locate a published decision from Arizona.   However, for what it is

5    worth, undersigned was able to find an unpublished lower court Minute Entry ruling exactly on point

6    and very instructive as to property rights in Arizona. Of particular note is the following:

7        "The Court rejects Calhoun's argument that the *Galco* litigation was primarily a commercial
         tort. While the *Galco* case had tort claims, it had significant non-tort components as well.
8
         But even if the Court considered the *Galco* litigation to be solely a commercial tort,
9        Calhoun's argument fails because Bank had a secured interest in the proceeds of the
         litigation. A.R.S. 47-9109 provides that all consensual security interests in personal property
10       and fixtures are covered by this article, except for transactions included by subsection D.
         Subsection D(12) provides: '12. An assignment of a claim arising in tort, other than a
11       commercial tort claim, but §§ 47-9315 and 47-9322 apply with respect to proceeds and
         priorities in proceeds.' Comment 15 states as follows: 'Note that once a claim arising in tort
12       has been settled and reduced to a contractual obligation to pay, the right to payment becomes
         a payment intangible and ceases to be a claim arising in tort.'
13
         The interplay between these sections was addressed in, *In re Pacific/West Communications
14       Group, Inc.*, 301 F.3d 1150 (9th Cir. 2002). There, the Ninth Circuit discussed the issue of
         whether a security interest attaches to the proceeds of a commercial tort claim. Based on the
15       law prior to 2001, the court held that it did not. However, the court noted that in 2001
         California (like Arizona) changed the Commercial Code. The court determined that
16       "effective July 1, 2001, California law now allows a security interest to be attached to the
         proceeds of a tort claim." *Id.* at 1152 (emphasis in original). The court concluded "[i]t is clear
17       that a party like [the security holder] can now attach its security interest to tort proceeds.
         Commentators who opposed the broad exclusion of § 9104(k) have been vindicated." *Id.* at
18       1155.

19       The Arizona change was identical to the California change."

20   See **Exhibit "C"** attached hereto and incorporated herein by reference - the September 16,

21   2019 Minute Entry Ruling and the Judgment issued on November 19, 2019 in *Calhoun Law Firm*

22   *PLC v. Fast Track Distributing LLC* (Superior Court of Arizona Maricopa County Case

23   No.CV2018-002638).

24   The fact remains that Byline, through its properly recorded UCC Financing Statement, is

25   secured by "All equipment, fixtures, inventory, accounts, instruments, chattel paper, general

26   intangibles, documents and deposit accounts now owned or hereafter acquired, together with all

27

28                                              9

1  replacements, accessions, proceeds, and products." (See Exhibit "F" attached to Debtor's Opening

2  Memorandum.). Clearly there is nothing for a Chapter 7 Trustee to administer. Nor is there going

3  to be any recovery for creditors unless that recovery far exceeds payment in full to Byline and

4  payment in full to the administrative creditors.

### Item C 6

6  The equities favor dismissal. There is absolutely no "hope" that creditors (all two of them)

7  will receive even one dime if this case is converted to a Chapter 7. Conversion will delay any

8  collection attempts either creditor may (or may not) pursue against the Debtor. "The economic

9  reality is undisputed". A dismissal of this Case is in the best interest of creditors and the estate. A

10  conversion to a Chapter 7 is in the best interest of Gloria Cales as she will buy her way out of a nasty

11  piece of litigation that puts the future of her legal practice at risk.

### CONCLUSION

13  Based upon the transparency of the motives behind Ms. Cales' wish to convert this case to

14  a Chapter 7, and considering that, upon conversion, there will be no payment to any creditor other

15  than Byline Bank, it is not in the best interest of creditors or this estate to convert the case. It is,

16  however, in the best interest of the creditors and this estate to dismiss the case.

17  WHEREFORE, and based upon the foregoing the Debtor respectfully requests that the Court

18  enter an Order dismissing this Chapter Eleven proceeding.

19  DATED this 26th day of February, 2021.

20  ALLAN D. NEWDELMAN, P.C.

21  /s/ RJS 011993

22  Roberta J. Sunkin, Esq.
    Attorney for Debtor

23  Copy of the foregoing
    mailed this 26th day
24  of February, 2021 to:

25  Jennifer Giaimo, Esq.
    Office of the US Trustee
26  230 North rt Avenue, #204
    Phoenix, AZ 85003

27

28  10

1  Christopher Simpson, Esq.
   STINSONLLP
2  1850 North Central Avenue
   Suite 2100
3  Phoenix, AZ 85004

4  Alan Meda, Esq.
   BURCH & CRACCHIOLO, PA
5  1850 North Central Avenue
   Suite 1700
6  Phoenix, 85004

7  Jill Perrella, Esq.
   Snell & Wilmer L.L.P.
8  1 South Church Avenue
   Suite 1500
9  Tucson, AZ 85701

10
   By /s/ RJ Sunkin

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28                                    11

# EXHIBIT "A"

# AFFIDAVIT IN SUPPORT

STATE OF WISCONSIN  )
                    )
ROCK COUNTY         )

LANE FITZGERALD, being affirmed and having reached the age of majority, makes this affidavit based upon information and belief and states:

1. I am an Attorney duly licensed to practice law in the State of Wisconsin and Illinois.

2. I was admitted to practice law in the State of Illinois via admission on motion.

3. My application for admission on motion is pending before the Supreme Court of Arizona.

4. My application for admission on motion has not been denied or closed.

5. Attorney Gloria L. Cales deliberately filed false documents with the Arizona Supreme Court and Superior Court in an attempt to have my application denied.

6. Attorney Cales filed these false documents after she stole all the assets from my law firm.

7. Attorney Cales did this deliberately to besmirch my reputation to cover up her theft from myself and the law firm's clientele.

8. Attorney Cales was involved in overbilling of her clients.

9. I discovered this fraud a few months after my purchase of her law firm.

10. Attorney Cales and her staff filed invoices that specifically annotated this fraud.

11. Attorney Cales made voluntary statements to me, that were recorded, admitting to the fraudulent activity.

12. The only reason my application is still pending and has not been approved is because of the false statements made by Attorney Cales.

13. Any statement that I am unable to obtain licensure in the State of Arizona is a patent falsehood.

Lane Fitzgerald

Signed and affirmed to before me
on 2-22-21

Notary Public, State of Wisconsin
My commission permanent

PETER MARTIN ANDERSON
NOTARY
PUBLIC
STATE OF WISCONSIN

# EXHIBIT "B"

## Cakes & Fitzgerald

Allan NewDelman <anewdelman@adnlaw.net>

Sun 10/25/2020 11:20 AM

**To:** Christopher Simpson <CSimpson@stinson.com>
**Cc:** Allan NewDelman <anewdelman@adnlaw.net>
**Bcc:** Allan NewDelman <anewdelman@adnlaw.net>



Chris: I had a chance this weekend to review in more detail the schedules and motion for stay relief. When I expressed an interest in a dismissal your comments suggested that such a move would not be in the " best interest " of general creditors. You noted the non- binding proposal from Cales at approximately $450,000 which has now been provided to the court.
Here's my questions: Has Byline agreed to forego its lien on " accounts" and "general intangibles "? Would Byline not claim a first position on any settlement sums thus leaving creditors with zero and no funds available for administrative claims? Have you given any thought to leasing out the real estate in order to cover the on- going monthly interest payment as adequate protection? In fact Byline might be over secured. Byline might also be paid from the litigation proceeds thus leaving the building free and clear.
Any thoughts. Thanks.
Sent from my iPad

## RE: Cakes & Fitzgerald

Simpson, Christopher <christopher.simpson@stinson.com>
Sun 10/25/2020 2:55 PM
**To:** Allan NewDelman <anewdelman@adnlaw.net>
**Cc:** Simpson, Christopher <christopher.simpson@stinson.com>

Thank you. I don't see any way the building gets free and clear (as explained below), but appreciate the thought process.



We could talk to Byline about a lease situation that services the loan, long shot, but one never knows. (I would like to learn more as to whether you could convince Collins to force that outcome). One reason Byline may consider it is if they have a weakness in their SBA guaranty. The security agreement was not filed with their lift stay. I have asked for a copy- maybe you have one. In my preliminary discussions with Byline's counsel, I was surprised to hear that it was their understanding that the building and FF&E were Bylines' only collateral. I am all in favor of a lift stay response by the Debtor that pins Byline down on its security position.

Regarding your question on general intangibles, as you know commercial tort claims are specifically excluded from general intangibles. Byline made no attempt to secure an interest in commercial tort claims under their UCC-1.

Thank you again for your email below, when we disagree It is my hope we can coordinate on these issues to avoid any collateral damage to the estate and look forward to doing so. I applaud your cooperative approach expressed below and would like to hear more about your thoughts on a lease.
Chris

Christopher Simpson
Partner

STINSON LLP
1850 N. Central Avenue, Suite 2100
Phoenix, AZ 85004-4584
Direct: 602.212.8623 \ Mobile: 602.697.5614 \ https://www.stinson.com/people-ChristopherSimpson

Assistant: Lindsay Petrowski \ 602.212.8512 \ mailto:lindsay.petrowski@stinson.com

http://www.stinson.com

This communication (including any attachments) is from a law firm and may contain confidential and/or privileged information. If it has been sent to you in error, please contact the sender for instructions concerning return or destruction, and do not use or disclose the contents to others.

-----Original Message-----
From: Allan NewDelman <anewdelman@adnlaw.net>
Sent: Sunday, October 25, 2020 11:20 AM
To: Simpson, Christopher <christopher.simpson@stinson.com>
Cc: Allan NewDelman <anewdelman@adnlaw.net>
Subject: Cakes & Fitzgerald

## Re: Invoices

Allan NewDelman <anewdelman@adnlaw.net>

Thu 11/5/2020 8:20 PM

**To:** Alan Meda <ameda@bcattorneys.com>
**Cc:** Simpson, Christopher <christopher.simpson@stinson.com>; Stallard, Kent <kent.stallard@stinson.com>; Ed Fleming <efleming@bcattorneys.com>
**Bcc:** lane@thefitzgeraldlawfirm.com <lane@thefitzgeraldlawfirm.com>

I would like to explore a different proposal. Byline filed its secured POC in excess of 1M dollars. The Security Agreement attached to the POC is very comprehensive and includes contract and tort claims. The real estate will only net the estate the approximate sum of $475,000 by sale or foreclosure. This would leave Byline with a secured claim in excess of $565,000 against the estate. The general unsecured creditors are primarily the former clients of Cales & Fitzgerald PLLC. All of these claims are unliquidated, contingent and speculative, at this time.

Gloria Cales wants "the clients" removed from the mailing list. The Debtor correctly listed all known creditors, whether disputed, contingent or unliquidated.

The chapter 11 was filed to block the non- judicial foreclosure sale. From hindsight, the commercial building is not worth more than $480,000 to $500,000. After selling costs the net to the estate would be on target with a credit bid at foreclosure. I requested a minimum credit bid of $500,000 from Byline and was informed that due to the SBA guaranty, the credit bid would have to be the appraised value less costs.

Accordingly, fees and expenses must stop immediately by all parties. I recommend a voluntary dismissal of the chapter 11 and to compensate the sub-part V trustee for his fees and cost to date.

My office has filed a sub-part V Status Report and an Amended Answer to the Motion for Stay Relief. There's a hearing on Monday. I invite your comments.

Sent from my iPad

> On Nov 5, 2020, at 7:28 PM, Alan Meda <ameda@bcattorneys.com> wrote:
>
> I understand that Gloria and Fitzgerald agree to disagree on many issues but why can't we remove the clients from the mailing list for now, extend the POC deadline and give them notice when it is relevant? -Alan
>
> Sent from my iPhone
>
>> On Nov 5, 2020, at 7:25 PM, Simpson, Christopher <christopher.simpson@stinson.com> wrote:
>>
>> Kent,
>> I have reviewed the 19 invoices you provided.
>> Thank you,
>> Is this the universe of clients that the Debtor believe may have a claim against the estate?
>> Thank you,
>> Chris

## RE: Invoices

**Simpson, Christopher** <christopher.simpson@stinson.com>

Thu 11/5/2020 9:08 PM

To: Allan NewDelman <anewdelman@adnlaw.net>; Alan Meda <ameda@bcattorneys.com>
Cc: Stallard, Kent <kent.stallard@stinson.com>; Ed Fleming <efleming@bcattorneys.com>; Simpson, Christopher <christopher.simpson@stinson.com>

Mr. NewDelman,

As you know, It my position that Byline has no lien on the commercial tort claims.  Your client listed former clients as unsecured creditors based on his allegations of overbilling.  Dismissal is a transparent attempt to take compensation from unsecured creditors in favor of covering Mr. Fitzgerald's guarantee liability.

It seems to me there is a gatekeeping question. Has Lane Fitzgerald determined that the claims of overbilling were in error?

**Christopher Simpson**

Partner

STINSON LLP

1850 N. Central Avenue, Suite 2100

Phoenix, AZ 85004-4584

Direct: 602.212.8623 \ Mobile: 602.697.5614 \ Bio

Assistant: Lindsay Petrowski \ 602.212.8512 \ lindsay.petrowski@stinson.com

**STINSON.COM**

**From:** Allan NewDelman <anewdelman@adnlaw.net>
**Sent:** Thursday, November 5, 2020 8:21 PM
**To:** Alan Meda <ameda@bcattorneys.com>
**Cc:** Simpson, Christopher <christopher.simpson@stinson.com>; Stallard, Kent <kent.stallard@stinson.com>; Ed Fleming <efleming@bcattorneys.com>
**Subject:** Re: Invoices

**External Email – Use Caution**

I would like to explore a different proposal. Byline filed its secured POC in excess of 1M dollars. The Security Agreement attached to the POC is very comprehensive and includes contract and tort claims. The real estate will only net the estate the approximate sum of $475,000  by sale or foreclosure. This would leave Byline with a secured claim in excess of $565,000 against the estate. The general unsecured creditors are primarily the former clients of Cales & Fitzgerald PLLC. All of these claims are unliquidated, contingent and speculative, at this time.

Gloria Cales wants "the clients" removed from the mailing list. The Debtor correctly listed all known creditors, whether disputed, contingent or unliquidated.

The chapter 11 was filed to block the non- judicial foreclosure sale. From hindsight, the commercial building  is not worth more than $480,000 to $500,000. After selling costs the net to the estate would be on target with a credit bid at foreclosure. I requested a minimum credit bid of $500,000 from Byline and was informed that due to the SBA guaranty, the credit bid would have to be the appraised value less costs.

Accordingly, fees and  expenses must stop  immediately by all parties. I recommend a voluntary dismissal of the chapter 11 and to compensate the sub-part V trustee for his fees and cost to date.

My office has filed a sub-part V Status Report and an Amended Answer to the Motion for Stay Relief. There's a hearing on Monday. I invite your comments.

Sent from my iPad

# EXHIBIT "C"

SUPERIOR COURT OF ARIZONA
MARICOPA COUNTY

CV 2018-002638                                        09/16/2019


HONORABLE ROGER E. BRODMAN              CLERK OF THE COURT
                                                         T. DeRaddo
                                                         Deputy


CALHOUN LAW FIRM P L C, THE            S JAY CALHOUN

v.

FAST TRACK DISTRIBUTING L L C, et al.   DOUGLAS H ALLSWORTH


                                                         JAMES M COOL
                                                         LISA SUE KASS
                                                         WILLIAM T LUZADER III
                                                         CHASE REDDEFORD TURRENTINE
                                                         JUDGE BRODMAN


**RULING ON CROSS MOTIONS FOR SUMMARY JUDGMENT**


     The Court reviewed the parties' cross motions for summary judgment, the responses and replies. The Court reviewed the Second Amended Complaint ("SAC"). The Court held oral argument on September 13, 2019.

### I. BACKGROUND

     This action relates to a dispute over $55,000 in settlement proceeds from an action entitled *Fast Track Distributing, LLC v. Galco Manufacturing, LLC*. The Calhoun Law Firm ("Calhoun") represented Fast Track in the *Galco* case pursuant to an hourly fee contract dated April 10, 2014[1]. Fast Track brought a variety of claims against Galco and other defendants,

---

[1] Although Bank argues that the contract is unsigned, Bank presents no evidence to challenge Calhoun's uncontested evidence that the April 10 agreement defines the attorney/client relationship.

CV 2018-002638                                            09/16/2019

including tort claims and non-tort claims. *See* Complaint and Second Amended Complaint in CV2014-093376 ("*Galco* Complaint" or "*Galco* SAC"). Calhoun billed by the hour and sent monthly invoices. As the unpaid fees mounted, Calhoun claims that Fast Track's manager, Tanner Gould, agreed in March 2017 that any funds received from the Galco defendants to settle the case would be applied to Calhoun's unpaid legal fees. Calhoun Aff. at ¶ 7.

In early April 2017, Calhoun negotiated a settlement with Galco paying to Fast Track $55,000, with the litigation dismissed with prejudice and each side bearing its own fees and costs. The parties filed a notice of settlement on April 13, 2017. On May 2, 2017, Penny Gould sent Calhoun an email stating that Calhoun was terminated and that the Arboleda law firm would be taking care of Fast Track's legal needs. At this time, Calhoun claims it was owed unpaid attorneys' fees of over $95,000 by Fast Track. Calhoun told Arboleda that Calhoun had a charging lien on the settlement funds. SAC at ¶ 22. On June 13, 2017, Arboleda received the $55,000 settlement check from Galco. Arboleda paid himself $8,067.50, leaving a balance of $46,903.50 (the "Disputed Funds"). A stipulation to dismiss all claims in the *Galco* litigation was filed on June 29, 2017.

MidFirst Bank ("Bank") had loaned Fast Track $249,000 and had a security interest in all rights to payments and proceeds from Fast Track to secure payment of the loan. Bank perfected its security interest on January 16, 2014, approximately three months before Calhoun initiated representation of Fast Track in the *Galco* litigation. In April 2017, Bank learned that Fast Track was closing its business so Bank took possession of Fast Track's collateral. Bank sold the collateral in May 2017. Bank alleges that Fast Track owes it $140,631.66. BSOF ¶ 17. Calhoun submits no admissible evidence to challenge Bank's claim of Fast Track's debt. As a result, this fact is deemed admitted.

Bank claims it is entitled to all of the Disputed Funds because it has not been paid on the loan and it has a priority security interest. Calhoun claims that it is entitled to the Disputed Funds because of its attorneys' lien which takes priority over any claim by Bank.

All other interested parties have waived any claim to the Disputed Funds. As a result, the instant cross motions ask this Court to resolve the question of whether the Disputed Funds should be paid to Calhoun or Bank.

## II. DISCUSSION OF ATTORNEYS' CHARGING LIENS

"The Arizona Supreme Court has recognized that in a contingency fee arrangement, attorneys' fees are deducted from a judgment before any funds are disbursed to the client." *State ex rel. Raber v. Wang*, 230 Ariz. 476, 478, ¶ 9 (App. 2012), *citing Linder v. Lewis, Roca, Scoville & Beauchamp*, 85 Ariz. 118, 123 (1958).

Docket Code 926                        Form V000A                              Page 2

CV 2018-002638                                    09/16/2019

*In Langerman Law Offices, PA v. Glen Eagles at Princess Resort*, LLC, 220 Ariz. 252 (App. 2009), the court discussed attorneys' charging liens and stated the following:

> To establish that it has a common-law charging lien on the judgment, [the attorney] must demonstrate, at a minimum, that it is owed attorneys' fees under its contingency fee contract with [plaintiff] and that there is some judgment in [plaintiff's] favor to which a charging lien can attach. Whether [plaintiff] owes [attorney] attorneys' fees is a matter of contract.

*Id.* at 254, ¶ 6 (citations omitted).

The *Langerman* court cited *Nat'l Sales & Serv. Co. v. Superior Court*, 136 Ariz. 544, 545 (1983) for the proposition that charging liens "attach to the funds or other property created obtained by the attorney's efforts. . . . [S]uch a lien arises **only** when it appears that the parties **looked to the fund itself** for the payment of the attorney's fee." (Emphasis added)

## III. ANALYSIS

### A. Does Calhoun have a Charging Lien?

Simply stated, attorneys' liens apply on contingency fee cases. Here, undisputed evidence shows that the contract between Calhoun and Fast Track was not a contingency fee. Calhoun has no attorneys' lien.

A requirement for an attorneys' lien requires that the parties "look to the fund itself" for payment of the attorney's fee. Undisputed evidence shows that the parties did not look solely to the fund for recovery of fees. As noted in the contract, Calhoun was not on a contingency basis but billed at $200 per hour. Calhoun Exh. 1 at p.2. Moreover, the contract itself makes clear that payment is not solely from the funds recovered. The letter states:

> We prepare statements each month for mailing by the 15th. The statements will show the fees and expenses incurred during the previous month. . . Payment of each month's statement is due when you receive our statement and we will withdraw the amount from the advanced deposit.

*Id.* The fact that payment was due on each month's statement upon receipt belies any claim that recovery was limited to the funds recovered. In *Campbell Law Group Chartered v. Jagelski*, 2016 WL 6659543, *4 (Ariz. App. 2016), the court of appeals noted that "for a charging lien to arise, it must appear that the parties agreed to look to a certain fund to pay the attorney." The

court found no charging lien because the lawyer's "fee agreement was an hourly fee arrangement that pointed to no such fund."

In addition, Calhoun alleges that Fast Track's current unpaid principal balance in legal fees is $95,559, excluding interest. CSOF at ¶ 26. This allegation demonstrates that the settlement proceeds alone were not intended to satisfy Calhoun's claim for attorneys' fees.

Calhoun makes no allegation that the hourly contract was converted into a contingency fee contract. There is no evidence that Fast Track and Calhoun had an agreement changing the contract. Indeed, ER 1.5(c) requires that any contingent fee agreement "shall be in writing signed by the client." There is no evidence of any fee agreement signed by Fast Track.[2] There is no signed writing documenting Ms. Calhoun's statement that Fast Track agreed in March 2017 to allow Calhoun to make a claim against all of the settlement proceeds.

Calhoun argues that the fee agreement requires Fast Track to pay "the Firm's fees from any recovery." Fee Agreement at p. 4. This language does not rescue Calhoun. The fee agreement still was not a contingency, and the language in question does not state that the payment of fees must come solely from the proceeds recovered. (Indeed, Calhoun contends that it is owed over $95,000 in unpaid legal fees.) The cited language comes from the portion of the fee agreement related to "Termination of Representation" and specifically notes that Calhoun can terminate its services "in the event that Client fails to timely pay the monthly statements." *Id.* While the language in question could create a contract action against Fast Track, it does not create a lien.

Calhoun argues that equity demands that it be awarded its fees. The Court disagrees. Under a typical contingency fee arrangement, Fast Track and Bank would benefit from the settlement because it would receive its (usually 2/3) share. Under Calhoun's argument, Bank gets nothing and the only entity to benefit from the settlement is Calhoun. The reality is that Calhoun's lawsuit generated more fees than recovery.

Finally, an attorney's lien is based on the parties' agreement. Here, the record does not support a claim that Calhoun and Fast Track had an agreement that the proceeds would fund the litigation from the outset. Rather, Calhoun alleges that the oral agreement was formed in March

---

[2] Under Calhoun's theory, no portion of the settlement would ever be paid to or received by Fast Track or Bank. The Court is troubled by the prospect that an attorney could continue litigation on behalf of the client with the knowledge that the entirety of the recovery would be paid to the lawyer, thus resulting in a situation where the attorney continues the suit to maintain its claim for fees.

CV 2018-002638                                      09/16/2019

2017 on the eve of settlement. Calhoun Aff. at ¶ 7. There was no agreement to use the settlement to pay legal fees before that date. Even if Calhoun had a lien, at most it would be for fees and costs incurred after the agreement was reached.

In conclusion, the Court finds that Calhoun does not have an attorneys' charging lien as a matter of law.

B. Does the Bank have a Secured Interest in the Galco Settlement Proceeds?

Calhoun argues that Bank does not have a security interest in the proceeds of the litigation. Under A.R.S. § 47-9204(B)(2), a security interest does not attach under a term constituting an after-acquired property for a commercial tort claim. This means that an after-acquired property clause in a security agreement does not reach future commercial tort claims. In order for a security interest in a tort claim to attach, the claim must be in existence when the security agreement is authenticated. In addition, the security agreement must describe the tort claim with greater specificity than simply "all tort claims." See § 9-108(e).

Calhoun argues that Bank has no security interest in the Galco suit because the suit is after-acquired security in a commercial tort that was not properly identified. Bank responds by arguing its security interest is in the proceeds of the litigation. Among other matters, Bank's Collateral Description included all accounts, inventory, equipment and general intangibles, and any rights to payment, "whether or not earned by performance, including but not limited to, payment for property or services sold, leased, rented, licensed or assigned." The Collateral Description applied to property now owned or hereinafter acquired. The Collateral Description included:

> All proceeds (including insurance proceeds) from the sale, destruction, loss or other disposition of any of the property described in this Collateral section, and sums due from a third party who has damaged or destroyed the collateral or from the party's insurer, whether due to judgment, settlement or other process.

BSOF ¶ 4. Thus, the Collateral Description encompasses a lien on Fast Track's inventory and general intangibles.

Whether the Galco litigation was a commercial tort claim is subject to debate. In the multi-count complaint, several causes of actions were commercial torts. Others were not. See Galco SAC. There was an unjust enrichment count. Count 1 is a claim that the Galco defendants

CV 2018-002638                                      09/16/2019

converted Fast Track's property in the amount of $129,500[3] without paying for it. Count 3 states that Galco received property from Fast Track with the expectation and understanding that defendants would pay for such property, again asserting damages of $129,500. Contract claims were brought against Mr. Pacheco and Ms. Logan based on the "employee handbook." Count 14 states a contract claim for breach of the implied duty of good faith and fair dealing. There were claims that Galco misappropriated Fast Track's confidential information. In reality, the *Galco* litigation had components of both tort and non-tort claims.

The Court rejects Calhoun's argument that the *Galco* litigation was primarily a commercial tort. While the *Galco* case had tort claims, it had significant non-tort components as well.

But even if the Court considered the *Galco* litigation to be solely a commercial tort, Calhoun's argument fails because Bank had a secured interest in the proceeds of the litigation. A.R.S. 47-9109 provides that all consensual security interests in personal property and fixtures are covered by this article, except for transactions included by subsection D. Subsection D(12) provides: "12. An assignment of a claim arising in tort, other than a commercial tort claim, but §§ 47-9315 and 47-9322 apply with respect to proceeds and priorities in proceeds." Comment 15 states as follows: "Note that once a claim arising in tort has been settled and reduced to a contractual obligation to pay, the right to payment becomes a payment intangible and ceases to be a claim arising in tort."

The interplay between these sections was addressed in *In re Pacific/West Communications Group, Inc.*, 301 F.3d 1150 (9th Cir. 2002). There, the Ninth Circuit discussed the issue of whether a security interest attaches to the proceeds of a commercial tort claim. Based on the law prior to 2001, the court held that it did not. However, the court noted that in 2001 California (like Arizona) changed the Commercial Code. The court determined that "effective July 1, 2001, California law now allows a security interest to be attached to the *proceeds* of a tort claim." *Id.* at 1152 (emphasis in original). The court concluded "[i]t is clear that a party like [the security holder] can now attach its security interest to tort proceeds. Commentators who opposed the broad exclusion of § 9104(k) have been vindicated." *Id.* at 1155.

---

[3] Perhaps in anticipation of the "commercial tort" argument, the *Galco* SAC seems assiduously drafted to avoid using the word "contract." But this is a ruse. In the original Complaint, Fast Track expressly sued Pachaco for breach of contract. In the *Galco* SAC, there is no longer a claim for breach of contract but Pachaco and Logan were now sued for "breach of duty of loyalty" based on the Fast Track employee handbook. Galco and the Logans also were sued under a claim for breach of the implied duty of good faith and fair dealing. *See* SAC, Count 14. All of these counts are contract claims under a different name.

Case 2:20-bk-10911-DPC   Doc 136   Filed 02/26/21   Entered 02/26/21 09:58:03   Desc
Main Document      Page 26 of 30

The Arizona change was identical to the California change.

*Pacific/West Communications Group* is persuasive. Thus, the Court concludes that the Bank had a security interest in the Disputed Funds, regardless of whether the claim is a commercial tort or something else.

Finally, even if Calhoun had an attorneys' charging lien, it would be inferior to Bank's security interest. Bank's security interest was first in time. In *McGonigle v. Combs*, 968 F.2d 810, 829 (9th Cir. 1998), the Ninth Circuit applied Kentucky law to hold that a perfected security interest that is prior in time is superior to a later attorneys' lien. The *McGonigle* court noted that "[w]hile there are equities on both sides of this issue, " the secured lender had the better claim. *Id.* The Court finds the *McGonigle* reasoning persuasive.

## IV. ORDERS

IT IS ORDERED that Calhoun's motion for summary judgment is denied.

IT IS ORDERED that the Bank's motion for summary judgment is granted.

IT IS FURTHER ORDERED that, within 10 days of the filed date of this Order, Bank shall submit a proposed form of judgment. Any applications for attorneys' fees or costs should be made at the same time.

Clerk of the Superior Court
*** Filed ***
11/21/2019 8:00 AM

SUPERIOR COURT OF ARIZONA
MARICOPA COUNTY

CV 2018-002638
Consolidated

11/19/2019

CLERK OF THE COURT
HONORABLE ROGER E. BRODMAN                    M. Corriveau
                                              Deputy

CALHOUN LAW FIRM P L C, THE            S JAY CALHOUN

v.

FAST TRACK DISTRIBUTING L L C, et al.    DOUGLAS H ALLSWORTH

                                         JAMES M COOL
                                         LISA SUE KASS
                                         WILLIAM T LUZADER
                                         CHASE REDDEFORD TURRENTINE
                                         DOCKET-CIVIL-CCC

**RULE 54(b) JUDGMENT**

The Court issues the following judgment concerning claims made in this case:

In CV2018-012139, Plaintiff MidFirst Bank filed a complaint for foreclosure of a personal property lien seeking a judgment that it held a valid first position security interest and lien granted to it by Fast Track Distributing, LLC ("Fast Track"), pursuant to its loan documents and the applicable sections of the Uniform Commercial Code, upon the $46,932.50 of settlement proceeds (the "Settlement Proceeds") of the *Fast Track Distributing, LLC v. Galco Manufacturing, LLC* (the "Galco Lawsuit"). MidFirst Bank filed the complaint against the Calhoun Law Firm, PLC (the "Calhoun Firm"), Jay Calhoun as an individual, and other defendants. On February 28, 2019, the Court granted Jay Calhoun's motion to dismiss. On September 18, 2019, the Court granted MidFirst Bank's motion for summary judgment against the Calhoun Firm and ruled that MidFirst Bank has priority to the Settlement Proceeds because it holds a valid first position perfected security interest in the Settlement Proceeds. The $46,932.50

has been deposited with the Clerk of the Court, and all other defendants have waived any claims to the Settlement Proceeds.

CV2018-012139 was consolidated into CV2018-002638 on December 3, 2018. In the consolidated action, the Calhoun Firm sued (a) Fast Track; (b) Carlos Arboleda and his wife, and Arboleda Brechner, LLC (the "Arboleda Defendants"); and (c) Andrew Harnisch and his wife, and Minkin and Harnisch, PLLC (the "Harnisch Defendants"). On June 19, 2019, the Court granted the Harnisch Defendants' motion to dismiss. Although the Court has not received a formal stipulation to dismiss, on October 21, 2019 the Court received a "Notice of Settlement" indicating that the Calhoun Firm, Fast Track and the Arboleda Defendants have reached a settlement.

Upon dismissal of the Calhoun Firm's claims against Fast Track and the Arboleda Defendants, this case will be resolved in its entirety. Because the Court has not yet received the formal stipulation of dismissal, however, the Court cannot enter a Rule 54(c) judgment. Therefore, the Court believes that a Rule 54(b) judgment is appropriate at this time. Since the case is likely to soon be resolved in its entirety, the Court expressly determines there is no just reason for delay and the following judgment is entered under Rule 54(b).

**IT IS ORDERED, ADJUDGED AND DECREED** that judgment is entered in favor of Jay Calhoun as an individual against MidFirst Bank and that MidFirst Bank take nothing by way of its complaint against Jay Calhoun as an individual.

**IT IS ORDERED, ADJUDGED AND DECREED** that judgment is entered in favor of Andrew Harnisch and Jane Doe Harnisch, husband and wife, and Minkin and Harnisch, PLLC and against the Calhoun Law Firm, PLC and that the Calhoun Law Firm take nothing by way of its complaint against Andrew Harnisch and Jane Doe Harnisch, husband and wife, and Minkin and Harnisch, PLLC.

**IT IS ORDERED, ADJUDGED AND DECREED** that judgment is entered in favor of MidFirst Bank on its claim for declaratory judgment and that MidFirst Bank is entitled to the disputed funds known as the Settlement Proceeds that are currently held by the Clerk of the Court. The Court finds that MidFirst Bank has a valid first position perfected security interest in the Settlement Proceeds.

**IT IS FURTHER ORDERED, ADJUDGED AND DECREED** that the Clerk of the Court pay the Settlement Proceeds in the amount of $46,932.50 (deposit 10/07/19 receipt number 27454970) to MidFirst Bank c/o Folks Hess Kass, PLLC, 1850 North Central Avenue, Suite 1140, Phoenix, AZ 85004.

Case 2:20-bk-10911-DPC    Doc 136    Filed 02/26/21    Entered 02/26/21 09:58:03    Desc
                          Main Document         Page 29 of 30

CV 2018-002638                                                11/19/2019

**IT IS FURTHER ORDERED, ADJUDGED AND DECREED** that defendant Jay Calhoun is awarded attorneys' fees and costs against MidFirst Bank in the amount of $2,407.29 with interest accruing at the legal rate of 5.75 % from the date of judgment until paid.

**IT IS FURTHER ORDERED, ADJUDGED AND DECREED** that plaintiff MidFirst Bank is awarded attorneys' fees against the Calhoun Law Firm, PLC in the amount of $27,500 with interest accruing at the legal rate of 5.75 % from the date of judgment until paid.

**IT IS FURTHER ORDERED, ADJUDGED AND DECREED** that plaintiff MidFirst Bank is awarded costs against the Calhoun Law Firm, PLC in the amount of $1,041.22 with interest accruing at the legal rate of 5.75 % from the date of judgment until paid.

This Judgment is final pursuant to Ariz. R. Civ. Pro. 54(b) because there is no just reason for delay and entering a judgment at this time is in the interests of justice.

DATED this 20th day of November, 2019

/s/   Roger E. Brodman
HONORABLE ROGER E. BRODMAN
JUDICIAL OFFICER OF THE SUPERIOR COURT